**UNITED STATES of America,**

v.

**Allen RANDOLPH, Defendant.**

**No. 96 CR 1194 DAB.**

United States District Court,
S.D. New York.

March 25, 1997.

Mary Jo White, U.S. Atty. S.D. New York, New York City (David C. Finn, of counsel), for Government.

Leonard F. Joy, Legal Aid Society, New York City (Tanya E. Coke, of counsel), for Defendant.

### *MEMORANDUM AND ORDER*

BATTS, District Judge.

Defendant, Allen Randolph, moves to suppress physical evidence seized from him upon his arrest, namely a firearm, and his statements made as a result of the arrest. A hearing was held On March 14 and 21, 1997, pursuant to *United States v. Pena,* 961 F.2d 333 (2d Cir.1992). For the following reasons Defendant's motion is granted.

## I. THE TESTIMONY

On March 14, 1997, Thomas Korakis, a member of the street crime unit of the New York City Police Department for three years, and of the Department for seven years testified. (3/14/97 Trial Transcript ("Tr.") at 3, 32, 76.) On March 21, 1997, the Defendant and Officer Korakis' partner, Marta Rivera, a member of the New York City Police Department for five years testified. (3/21/97 Trial Transcript ("Tr.") at 61.)

According to Officer Korakis, on November 30, 1996, at approximately 12:15 a.m., Officers Korakis and Rivera were patrolling the area in the vicinity of Findlay Avenue and 167th Street in the Bronx. (3/14/96 Tr. at 4, 44; 3/21/97 Tr. at 62.) They were in an unmarked vehicle and in plainclothes. (3/14/97 Tr. at 4, 32; 3/21/97 Tr. at 62.) Officer Korakis was driving. (3/14/97 Tr. at 4; 3/21/97 Tr. at 64.)

As they were driving north on Findlay Avenue, (which is one way south-bound), they observed two men walking south on Findlay. (3/14/97 Tr. at 5, 35; 3/21/97 Tr. at 62.) One man appeared to be a teenager ("the minor") and the other man, the Defendant, appeared to be in his early to mid–20s. (3/14/97 Tr. at 6; 3/21/97 Tr. at 66.) The minor was wearing dark clothes and a black baseball hat, and the Defendant was wearing a white goosedown, three-quarter jacket with a black T-shirt that had white writing on it stating "Brooklyn." (3/14/97 Tr. at 6, 23, 62–64, 81–82; 3/21/97 Tr. at 19, 22 (Defendant testifies it was a green and white shirt); 3/21/97 Tr. at 66.) The Defendant had a bottle in his hand and the minor was carrying a cup. (3/21/97 Tr. at 63.)

Findlay Avenue has one lane of traffic with parked cars on both sides. (3/14/97 Tr. at 32–33.) The Defendant was walking on, what is in this case, the driver's side of the street. (3/14/97 Tr. at 8, 44; 3/21/97 Tr. at 62.) When Officer Korakis first saw the Defendant he was walking side by side with the minor, who was.closer to Officer Korakis, about three car-lengths away. (3/14/97 Tr. at 10, 44; 3/21/97 Tr. at 63 (Officer Rivera estimated 10–15 feet).) Then the Defendant discreetly passed something to the minor. (3/14/97 Tr. at 7, 47–48; 3/21/97 Tr. at 65

(Officer Rivera testified she saw Defendant pass a bottle to the minor).) When Officer Korakis was about 12 feet from them, he could see it was a Heineken bottle of beer. (3/14/97 Tr. at 7–8.) Defendant then bent down. (3/21/97 Tr. at 65.) The minor continued to walk; hence, he and the Defendant became separated. (3/21/97 Tr. at 64.) The officers decided to stop the car, near 1131 Findlay Avenue. (3/14/97 Tr. at 36, 39.) At this point, Officer Korakis may have asked the Defendant where he was going, otherwise there was no conversation. (3/14/97 Tr. at 58; 3/21/97 Tr. at 65 (Officer Rivera testified that there was no conversation).)

Officer Korakis stated that he stopped the car because "[b]oth men had looked in my direction. . . . [The minor] was walking with a white styrofoam cup. . . . As I drew closer to both males, I noticed that the defendant had passed something to the person that he was accompanied with. As I got closer I noticed it was a bottle of beer. . . ." (3/14/97 Tr. at 7.) "Our intention was to step out of the car and to reprimand the minor for drinking, drinking alcohol," (3/14/97 Tr. at 11), even though neither officer ever saw the minor drink out of the cup or the beer bottle. (3/14/97 Tr. at 45–46.)

When the officers stepped out of the car, Officer Korakis approached Defendant, "[f]or safety reasons," (3/14/97 Tr. at 13), and Officer Rivera went around the back of their vehicle and engaged the minor, who had both the cup and the bottle, in conversation. (3/14/97 Tr. at 12, 21, 70; 3/21/97 Tr. at 64.) The Defendant and Officer Korakis were about twelve feet away from the minor and Officer Rivera. (3/14/97 Tr. at 12, 20, 70.) Officer Korakis may have asked the Defendant what he was doing in the Bronx with a Brooklyn T-shirt. (3/14/97 Tr. at 82.) Otherwise, the only words uttered were the Defendant's, who stated "Are you going to take me for that?" (3/14/97 Tr. at 13, 20–21, 59–60.) Officer Korakis testifies that he did not understand this statement and became suspicious. (3/14/97 Tr. at 13–14.) As he stepped closer to the Defendant, the Defendant spontaneously and voluntarily opened his jacket. (3/14/97 Tr. at 14–15, 22, 60.) Officer Korakis, who stands with his hands close to his

chest, felt a metal object as the jacket opened and brushed against his left hand. (3/14/97 tr. at 16–17, 23, 68–69.) Defendant then closed his jacket, without saying anything, and Officer Korakis, fearing the metal object was a weapon, placed his hand over the area where he had felt the metal object. (3/14/97 Tr. at 17, 23–24.) Officer Korakis determined that it was a gun, so he put the Defendant up against a vehicle and rear-cuffed him. (3/14/97 Tr. at 17–18.) Then the Officer removed the weapon from the Defendant's top, left, inside jacket pocket. (3/14/97 Tr. at 24.) Defendant volunteered that he had a clip in his front pant's pocket. (3/14/97 Tr. at 24, 75; 3/21/97 Tr. at 24, 48 (Defendant testifies it was in his bottom, front, right-hand jacket pocket).) Also recovered was another bottle of beer. 3/14/97 Tr. at 25–26 (Officer Korakis states he recovered it on Findlay Avenue whereas Defendant claims it was recovered at the precinct. (3/21/97 Tr. at 25)). Defendant was then taken to the station house. (3/14/97 Tr. at 26.)

After leaving the vehicle, Officer Rivera identified herself to the minor and asked him what he had. (3/21/97 Tr. at 67.) He replied that he had a beer but that it was not his. (*Id.*) When asked who it belonged to, he indicated towards the Defendant. (*Id.*) At this time the Defendant and Officer Korakis were ten feet from Officer Rivera. (*Id.*) The minor had no identification. (*Id.* at 67–68.) When Officer Rivera looked over towards the Defendant a second time she noticed Officer Korakis looked surprised. (*Id.* at 68.) Officer Korakis then put the Defendant on the car. (*Id.*) Officer Rivera approached the Defendant to help Officer Korakis, (*Id.* at 70), and then told the minor to pour the contents of the cup and bottle into the street (*Id.* at 71.)

Officer Korakis did not talk to the minor, record any information from him, nor determine whether he was a minor. (3/14/97 Tr. at 49–52.) The firearm and clip were vouchered. (3/14/07 Tr. at 27–30.) However, the bottles, cup and coat were not vouchered. (3/14/97 Tr. at 71–72.)

According to the Defendant, he arrived on the corner of Findlay Avenue and 167th Street at approximately 12:05 a.m. on No-vember 30, 1997, with his fiance's cousin, the minor. (3/21/97 Tr. at 5, 11.) With him he had a blue plastic cup containing ice, a bottle of beer in his jacket and a firearm. (*Id.* at 5–6.) They approached a grocery store to purchase beer. (*Id.* at 9.) Defendant gave the minor the cup to hold. (*Id.* at 6–7, 9.) They then left the store because it was closing, crossed the street and walked south-bound on Findlay Avenue. (*Id.* at 8–11, 14.)

Defendant bent down to tie his shoe and the minor continued to walk. (*Id.* at 12.) When he stood up the minor was 15–20 feet in front of him. (*Id.* at 14.) The Defendant then saw a car, whose male occupant, which Defendant assumed was a police officer, asked him where he was going. (*Id.* at 15.) Defendant replied that he was going to the store. (*Id.* at 17.) The officer than asked "what for?" (*Id.*) Defendant replied, "to get some beer." (*Id.*) The officer then asked if the Defendant had anything else on him. (*Id.* at 32.) Defendant replied in the negative. (*Id.*)

The officer then got out of the car and approached the Defendant. (*Id.* at 17.) His female partner approached the minor. (*Id.*) The officer asked the Defendant if he had anything on him. (*Id.* at 17, 33.) Defendant replied in the negative. (*Id.* at 17, 32.) The officer then asked the Defendant what he was doing in the Bronx with a Brooklyn T-shirt. (*Id.* at 18.) The Officer then asked again if Defendant had anything on him. (*Id.* at 18, 33.) Defendant replied in the negative. (*Id.* at 18, 32.) Defendant's jacket was zipped up to his neck. (*Id.* at 20.)

The Officer grabbed under Defendant's arm and said "I thought you didn't have anything on you." (*Id.* at 18–19, 33.) The officer told the Defendant to put his hands on a vehicle. (*Id.* at 19.) Defendant was cuffed and the officer recovered the firearm. (*Id.*)

Defendant testified that he did not open his jacket or give the officer permission to search the jacket. (*Id.* at 23.)

## II.  DISCUSSION

A.  Motion to Suppress Evidence Seized from the Defendant

It is well established that a police officer has a right to inquire and "in appropriate

circumstances and in an appropriate manner, [may] stop a person for purposes of investigating possibly criminal behavior, even though there is no probable cause to make an arrest." *United States v. Bold,* 19 F.3d 99, 102 (2d Cir.1994) (citing *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880–81, 20 L.Ed.2d 889 (1968)), *cert. denied,* —— U.S. ——, 116 S.Ct. 2511, 135 L.Ed.2d 200 (1996). Similarly, under certain circumstances law enforcement officers are permitted to search individuals without probable cause. *Terry,* 392 U.S. at 22–27, 88 S.Ct. at 1880–83. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer to power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24, 88 S.Ct. at 1881; *see Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

Putting aside a determination of whether the officers approached the Defendant simply to inquire, or approached him to investigate criminal activity that they thought was afoot, the Court looks to Officer Korakis' behavior in actually searching the Defendant. Officer Korakis claims he felt a metal object as the Defendant's open jacket brushed against him.

The Court finds that parts of the testimony of both the Defendant and Officer Korakis are not believable and that the only totally credible witness was Officer Rivera, who unfortunately did not witness the events crucial for the Court's determination here. The Court finds that Officer Korakis' description of the events leading to his hand brushing against the Defendant's open coat is not credible. Specifically, the Court does not believe Officer Korakis' testimony that Defendant voluntarily opened his jacket, nor that it brushed against the Officer's hands which were held in his chest area. This being the only reason advanced for the officer feeling he had a basis to pat down the Defendant, and finding it not credible, the Court finds that the pat down of the Defen-

dant violated his Fourth Amendment rights. Accordingly, the firearm and Defendant's statements are suppressed as fruits of an illegal detention. *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963).

### III.  CONCLUSION

Defendant's Motion to Suppress the physical evidence seized from him is GRANTED. Defendant's Motion to Suppress his post-arrest statements in GRANTED.

SO ORDERED.